1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GILBERTO CALDERON, | ) | 1:08-cv-01015 GSA |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**BACKGROUND**

Plaintiff Gilberto Calderon ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//

_____

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On August 27, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

1

## FACTS AND PRIOR PROCEEDINGS[2]

2    On or about July 18, 2005, Plaintiff filed an application alleging disability since April 4,

3 2005, due to torn meniscus in both knees.  AR 95-96.  His application was denied initially and on

4 reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

5 AR 6, 9-14.  ALJ Edward D. Steinman held a hearing on December 12, 2007 , and issued an

6 order denying benefits on January 15, 2008.  AR 15-21, 241-62.  On May 22, 2008, the Appeals

7 Council denied review.  AR 3-5.

8    Hearing Testimony

9 _____ALJ Steinman held a hearing on December 12, 2007, in Bakersfield, California.  Plaintiff

10 appeared and was represented by Rosemary Abarca.  Plaintiff was assisted by a Spanish language

11 interpreter.  Vocational Expert ("VE") Kenneth Ferra also provided testimony.  AR 241.[3]

12    Plaintiff has not worked since April 4, 2005.  He previously worked as a laborer in the oil

13 fields and as a machine operator or puller in a lumber mill.  AR 245.

14    Plaintiff currently suffers from bilateral knee pain.  The pain is constant and he takes

15 Tylenol once or twice a week to treat the pain.  AR 245-46.  He can stand for about twenty

16 minutes before his knees become swollen and he has difficulty walking.  AR 247.  Plaintiff was

17 using a cane for assistance and used a brace on the right knee everyday.  He was scheduled for

18 surgery on the left knee in January of 2008.  AR 247.  Plaintiff testified that he can sit for about

19 twenty minutes before needing to move around.  AR 252-53.  He has been using the cane for

20 about two years, and does so everyday.  AR 253.

21    With regard to medication other than Tylenol, Plaintiff indicated that after his surgery the

22 pain medication he was taking affected his "nerves" and body and that it took six or seven

23 months "to get [his] regularity back."  AR 253.  He receives injections in both knees after talking

24 to his doctor about the pain medication, and the injections are to last six months.  However, the

25

26 _____

27    [2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

28    [3]On August 21, 2007, ALJ Bernard Trembly continued the administrative hearing to a later date to allow Plaintiff the opportunity to retain counsel.  *See* AR 235-40.

1  first injection lasted only four months, and he finds that the effect wears off after three or four

2  months.  AR 253-54.

3      Plaintiff has to move or elevate his legs every twenty to thirty minutes or so or "they get

4  stuck."  Further, he will lie down for thirty to forty minutes at a time before getting up.  AR 254-

5  55.  His sleep is disturbed because when he moves during sleep and his knees pop, it causes him

6  to lie awake for two to three hours.  AR 255.

7      Approximately ten pounds is the weight Plaintiff could carry without increasing the pain

8  in his knees.  AR 255.  He denied telling a doctor that he was able to pick up and carry fifty

9  pounds.  AR 255-56.  Overall, Plaintiff's knee problems are worsening.  AR 256.  As a result, he

10 can no longer work eight hours a day, five days a week.  AR 256.

11     Asked whether he could converse in English, Plaintiff indicated that he is able to speak

12 "[a] little of the basics," but he speaks the language better than he comprehends it.  AR 247.  He

13 spoke Spanish in his prior position because he frequently worked with others who spoke Spanish.

14 AR 248.  He does speak English with his children at home, for example, asking his daughter how

15 she is doing in school, whether there were any problems at school and about homework.  AR

16 248.  When Plaintiff goes to the store he can speak to the cashier in English if "it is something

17 easy," but if he needs something more than basic conversation permits, he cannot communicate

18 in English.  AR 249.

19     Plaintiff has never taken English language classes and he has learned to speak English

20 through his wife and children.  AR 249.  His wife primarily converses with him in Spanish, but

21 will occasionally do so in English.  His children speak with him in English.  AR 249-50.  He

22 watches television and can watch English language channels "sometimes . . . if it's not real hard"

23 but there are times he does not understand it all.  AR 250.  Reading and writing in English is

24 limited.  AR 250-51.

25     About once a day Plaintiff will drive to the store.  AR 251-52.  He does not carry the

26 groceries however.  AR 252.  He does not help his wife with chores like vacuuming, cleaning, or

27 laundry because he is barely able to walk.  AR 252.

28

1    VE Ferra testified that Plaintiff's prior work in the oil service industry is heavy and semi-

2    skilled, with a Dictionary of Occupational Titles ("DOT") code of 930.684-014 and an Specific

3    Vocational Preparation ("SVP") of 3.  The saw or lumber mill position as a supervisor is

4    classified as medium and skilled with a DOT code of 669.130-026 and an SVP of 7.  AR 246.

5    The VE was asked to assume a hypothetical worker, who can speak English and can

6    occasionally lift twenty pounds, frequently lift ten pounds, stand and walk three to four hours in

7    an eight-hour day, sit for six hours in an eight-hour day with intermittent position changes, may

8    not use ropes, ladders or scaffolds, but may occasionally climb, crouch or crawl, and avoid

9    uneven terrain.  AR 256-57, 259.  The VE concluded that the limitation of standing or walking

10   only two hours in an eight-hour day precluded light work.  Thus, the VE concluded the

11   hypothetical worker was restricted to sedentary work.  AR 259.

12   Approximately 200 sedentary type jobs are available, such as assembler, DOT code

13   734.687-018 with an SVP of 2.  More specifically, there are 20,000 such assembler positions in

14   the national economy and 2,000 in California.  AR 259.  Another sedentary position is nut sorter,

15   DOT code 521.687-086 with an SVP of 2.  There are approximately 1,500 nut sorter positions in

16   California, and about 15,000 in the national economy.  AR 259-60.  An order clerk is a DOT

17   code of 209.567-014 with an SVP of 2.  In California, there are approximately 4,000 order clerk

18   positions; in the nation, there are approximately 40,000.  AR 260.

19   In a second hypothetical, the VE was asked to assume a hypothetical worker that could

20   occasionally lift fifteen pounds, frequently lift ten pounds, stand or walk forty-five to sixty

21   minutes at a time, for a total of three to four hours in an eight-hour day with frequent position

22   changes, and who should avoid kneeling, squatting and climbing.  AR 261.  This individual, the

23   VE found, could perform the same work as that identified in the first hypothetical.  AR 261.

24   Medical Record

25   The entire record was reviewed by the Court, however, only those portions relevant to the

26   instant proceedings are briefly summarized below.

27

28

1   On April 6, 2005, Plaintiff was seen by Dr. Oliver Droppers at Kaiser Permanente in

2   Bakersfield for severe pain in the right knee.  Dr. Droppers considered possible torn cartilage

3   with a bucket handle tear and referred Plaintiff for an MRI and an appointment with an

4   orthopedist.  AR 186.

5   An MRI of the right knee, dated April 9, 2005, concluded degenerative change in the

6   medial joint compartment with some focal loss of articular cartilage and early subchondral signal

7   change, and a complex tear of the medial meniscus.  AR 162.

8   On April 21, 2005, Robert B. Christopher D.O. examined Plaintiff.  The results included

9   right knee tenderness, minimal grating was present at flexion and extension and Plaintiff was

10  unable to fully flex or extend the right knee.  Dr. Christopher noted a review of the MRI shows a

11  complex tear of the medial meniscus with significant degenerative joint disease on the medial

12  compartment with some minimal in the lateral compartment.  AR 178.

13  Surgery was performed on April 25, 2005 by Dr. Christopher.  The preoperative diagnosis

14  was internal derangement, right knee with complex tear medial meniscus and early degenerative

15  arthritis.  The surgeon performed an arthroscopy with partial medial meniscectomy of the right

16  knee.  AR 164-65.

17  Dr. Christopher prepared a report on May 5, 2005, following surgery.  Swelling was

18  down and range of motion had improved somewhat.  While tenderness remained, the pain was

19  less.  Plaintiff believed he was making satisfactory progress and sutures were removed.  AR 175.

20  The doctor believed a combined instability brace would allow for the possibility of Plaintiff's

21  return to work.  AR 175.

22  A May 20, 2005, progress note reports Plaintiff is "not really any better" and was

23  continuing to experience "clicking and catching" in the right knee after surgery.  He reported

24  difficulty walking.  AR 173.  Rehabilitation efforts were to continue and an MRI of the left knee

25  was recommended.  AR 174.

26  A physical therapy report dated June 8, 2005, prepared by Cory Frehner, noted objective

27  findings of decreased right knee extension at the end of the swing phase resulting in decreased

28

1   heel strike, medial right knee tenderness, and an increased range of motion.  It was recommended

2   Plaintiff continue receiving physical therapy.  AR 167.

3   In a report dated June 9, 2005, Dr. Christopher noted that Plaintiff reported tenderness

4   and swelling after he walks for a period of twenty-five to thirty minutes.  Plaintiff's need to

5   continue using the knee brace for stability was noted, and the doctor opined that Plaintiff was

6   "totally disabled in regards to the type of work" he performed as a "laborer . . . heavy work,

7   pulling, tugging."  AR 170.

8   Jonathan M. Gurdin, M.D., performed an orthopedic evaluation on December 15, 2005.

9   Plaintiff reported pain in his knees for the previous twelve to fourteen years with worsening pain.

10  Following surgery, Plaintiff complains of constant slight aching in the joint, that worsens with

11  activity including walking, standing, kneeling, squatting and climbing stairs.  Plaintiff reported

12  swelling every day and occasional popping, but no locking or collapsing.  An MRI of his left

13  knee showed a complex tear of the medial meniscus requiring surgery, but Plaintiff reported he

14  lost his medical coverage and was unable to have the surgery performed.  Plaintiff was using a

15  hinged brace on his right knee and occasionally used a cane.  Plaintiff reported he was limited to

16  walking two to three blocks and could be on his feet for thirty to forty minutes at a time.  He can

17  lift fifty pounds, but is unable to carry the weight due to his knee problems.  He avoids climbing

18  stairs.  AR 190.

19  Dr. Gurdin's physical examination noted Plaintiff was five feet, nine inches in height,

20  weighed 248 pounds with a prominent abdomen.  He was alert, cooperative and "speaks fairly

21  good English."  Plaintiff moved poorly about the examination room.  AR 190.

22  Plaintiff walked with a mild right-side antalgic limp.  He could perform the heel-to-toe

23  test on both feet and did not have any difficulty getting on and off the examination table, or lying

24  in the supine position and sitting back up.  AR 190.  Plaintiff did not complain of any back pain.

25  AR 190.  An examination of Plaintiff's right knee revealed surgical scars, slight soft tissue

26  swelling, and slight tenderness "medially about the joint line."  The ligament was intact.  There

27  was mild grinding and mild subpatellar crepitus with motion.  Plaintiff's left knee was not tender

28

1    and there was no soft tissue swelling present.  The ligament was intact.  "[V]ery slight grinding"

2    and "slight subpatellar crepitus with motion" was present in the left knee.  AR 191.

3           Range of motion with regard to the knees revealed 135 and 140 degrees flexion,

4    respectively; zero degrees extension on each knee was noted.  AR 191.

5           Dr. Gurdin diagnosed degenerative changes in the right knee with a prior arthroscopic

6    surgery, internal derangement of the left knee with probable degenerative changes, and obesity.

7    The doctor expressly noted that "the patient's excess weight is aggravating his knee problems."

8    AR 191.  The doctor stated:

9           At the present time he could probably be on his feet for no more than 45 to 60
            minutes at a time and for 3 or 4 hours out of 8 hours.  He could probably sit for 2
10          hours at a time and for 5 or 6 hours out of 8 hours but would need to frequently
            move his knees to minimize stiffness in the joints.  He would have considerable
11          difficulty kneeling, squatting and climbing stairs and should avoid these activities.
            He could probably lift at least 50 pounds but would have difficulty carrying with
12          knee pain.  He could probably lift and carry no more than 20 pounds to 25 pounds
            on a one-time basis, 15 pounds occasionally and 5 to 10 pounds frequently with
13          the knee problems.  Manual dexterity was intact.

14   AR 191.

15          On or about January 27, 2006, consultive medical examiner J. T. Bonner completed a

16   Physical Residual Functional Capacity Assessment.  Plaintiff's exertional limitations included

17   the ability to lift and carry twenty pounds occasionally, ten pounds frequently, to stand or walk

18   for at least two hours in an eight-hour workday, sit for about six hours in an eight-hour workday,

19   and with limited ability to push or pull with the lower extremities.  AR 192-193.  With regard to

20   postural limitations, the examiner noted Plaintiff should never climb ladders, ropes or scaffolds,

21   or kneel; he could occasionally climb ramps or stairs, crouch or crawl, and could frequently

22   balance and stoop.  AR 194.  The examiner did not find any manipulative, visual, or

23   communication limitations.  AR 195-196.  One environmental limitation was identified: Plaintiff

24   was to avoid concentrated exposure to hazards such as machinery and heights.  AR 196.  The

25   examiner noted that Plaintiff's symptoms were partially credible in light of his impairments, but

26   the severity and functional limitations claimed by Plaintiff were not fully supported by the

27   medical record.  AR 197.

28

1    Records from Kern Family Health Care ("KFHC") dated July 13, 2006, evidence Plaintiff

2  was complaining of right knee pain.  A referral to a rheumatologist was made, and medications

3  were prescribed to treat the pain.  AR 205-206.  An x-ray of the same date shows medial joint

4  narrowing and medial subluxation of the femur on the tibia due to arthritic changes.  AR 207.

5    On August 17, 2006, Plaintiff was treated at KFHC for continuing knee pain.

6  Prescription medications were refilled and a notation that he was "to see specialist" is included.

7  AR 211.

8    Treatment notes from KFHC dated December 5, 2006, note that Plaintiff had knee pain in

9  both knees, and had forgotten his medications while on vacation. The pain increases when he is

10  in a cold environment; Plaintiff denied any swelling or decreased range of motion.  Naproxen

11  was prescribed and he was to return in two months for a follow up.  AR 212.

12    On January 30, 2007, KFHC notes indicate Plaintiff was to see the rheumatologist the

13  following day.  His right knee was swollen and there was a decreased range of motion due to the

14  pain.  AR 214.

15    Nicholas T. Valos, M.D.'s notes regarding Plaintiff's treatment at KFHC were reviewed

16  for the period between October 11, 2006 and November 5, 2007.  AR 218-225.

17    On July 31, 2007, Robert Folsom, R.P.T. with Pair & Marotta Physical Therapy,

18  indicated initial treatment was tolerated well and Plaintiff had fair potential to decrease pain,

19  improve range of motion, improve strength and functional tolerance, and for a home exercise

20  program.  AR 232.

21    In an August 29, 2007, progress summary of Pair & Marotta Physical Therapy, it was

22  noted Plaintiff had attended 12 of his 13 appointments for treatment of his left knee. His left knee

23  range of motion was -16 degrees extension to 120 degrees flexion.   Plaintiff complained of pain

24  at a "6 to 7/10" and indicated his knee occasionally locked and was "unstable with 'every step.'"

25  AR 231.

26    ALJ's Findings

27    The ALJ determined that Plaintiff had the severe impairments of status post surgery for

28  torn meniscus in the right knee with degenerative changes, and torn meniscus in the left knee

8

1  with degenerative changes.  AR 17.  The ALJ found however that these severe impairments do

2  not meet or equal a listed impairment requiring a finding of disability.  AR 18.

3       Based on his review of the medical evidence, the ALJ determined that Plaintiff has the

4  residual functional capacity ("RFC") to perform sedentary work with certain limitations.  More

5  particularly, the ALJ found Plaintiff could lift or carry ten pounds frequently and fifteen pounds

6  occasionally, could stand or walk for forty-five to sixty minutes at a time for a total of three to

7  four hours in an eight-hour workday, could sit for two hours at a time for a total of five to six

8  hours in an eight-hour workday, each with frequent position changes, while avoiding kneeling,

9  squatting and climbing.  AR 18-19.

10       Given this RFC, the ALJ nevertheless found that Plaintiff could not return to his past

11  work as an oil service worker or supervisor.  He did not possess any skills transferable to other

12  work.  AR 19-20.  The ALJ determined however that Plaintiff could perform jobs that exist in

13  significant numbers in the national economy.  AR 20-21.

14                              **SCOPE OF REVIEW**

15       Congress has provided a limited scope of judicial review of the Commissioner's decision

16  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

17  the Court must determine whether the decision of the Commissioner is supported by substantial

18  evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

19  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

20  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

21  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

22  401.  The record as a whole must be considered, weighing both the evidence that supports and

23  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

24  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

25  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

26  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

27  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

28

1  substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

2  Cir. 1987).

3  **REVIEW**

4       In order to qualify for benefits, a claimant must establish that he is unable to engage in

5  substantial gainful activity due to a medically determinable physical or mental impairment which

6  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

7  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

8  such severity that he is not only unable to do his previous work, but cannot, considering his age,

9  education, and work experience, engage in any other kind of substantial gainful work which

10  exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

11  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

12  Cir. 1990).

13       In an effort to achieve uniformity of decisions, the Commissioner has promulgated

14  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

15  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  This five-step analysis can be summarized as

16  follows: (1) determination of whether the claimant is engaged in substantial gainful activity; if so

17  engaged, the claimant is not presumed disabled and the analysis ends; (2) if not engaged in

18  substantial gainful activity, determination of whether the claimant has a severe impairment; if

19  not, the claimant is not presumed disabled and the analysis ends; (3) if the claimant has a severe

20  impairment, determination of whether any such severe impairment meets any of the impairments

21  listed in the regulations; if so, the claimant is disabled and the analysis ends; (4) if the claimant's

22  impairment is not listed, determination of whether the impairment prevents the claimant from

23  performing his or her past work; if not, the claimant is not presumed disabled and the analysis

24  ends; and (5) if the impairment prevents the claimant from performing his or her past work,

25  determination of whether the claimant can engage in other types of substantial gainful work that

26  exist in the national economy; if so, the claimant is not disabled and the analysis ends.

27       Here, Plaintiff argues that the ALJ failed to fulfill his burden of establishing that Plaintiff

28  is literate in the English language, and thus, this Court should reverse and order an award of

10

1  benefits. (Doc. 13 9-13.)  Plaintiff also argues the ALJ failed to articulate clear and convincing

2  reasons for rejecting his pain testimony.  (Doc. 13 at 14-21.)

3  **DISCUSSION**

4  _____**A.**   ***Plaintiff's English Language Skills***

5  Plaintiff argues the ALJ erred by failing to make a finding as to whether Plaintiff is

6  literate or illiterate in English.  (Doc. 13 at 9-13.)  More particularly, Plaintiff argues two separate

7  findings are required by the ALJ: (1) whether or not a claimant is literate in English; and (2)

8  whether or not a claimant can communicate or speak in English.  (Doc. 13 at 10-11.)  Defendant

9  contends the ALJ did not err for he was not required to rely on the Grids in light of the VE

10 testimony, that even had the ALJ been required to apply the Grids, the Grid identified by Plaintiff

11 is inapplicable, and, finally, that the ALJ did in fact make a sufficient finding that Plaintiff was

12 literate in English.  (Doc. 19 at 10-13.)

13 The ALJ found that Plaintiff is unable to perform his past relevant work as an oil service

14 worker and supervisor, as those positions were classified as heavy and medium, respectively.

15 AR 19.  The VE concluded Plaintiff had no skills or semi-skills that were transferable.  AR 20.

16 The ALJ acknowledged Plaintiff was forty-five years old, and stated as follows with regard to

17 education and language skill:

18 The claimant is able to speak in English, even though his primary language is
   Spanish.  While an interpreter was used at the hearing, the undersigned was able
19 to directly communicate with the claimant in English.  His children and wife
   occasionally speak English and he converses with them in English.  When he goes
20 out, he speaks English in stores.  He is able to watch TV programs in English.  He
   understands more than he speaks in English.  He has a limited ability to read and
21 write in English.  He completed nine years of formal education.

22 AR 20.

23 **1.    The Grids**

24 The grids may be used only where they "completely and accurately represent a claimant's

25 limitations."  *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999); *see Jones v. Heckler*, 760

26 F.2d 993, 998 (9th Cir. 1985). Accordingly, if a claimant suffers from non-exertional limitations,

27 the ALJ may not apply the grids because they are based on strength factors only. See 20 C.F.R.

28 Part 404, Subpt. P, App. 2, § 200.00(b); *see also* 20 C.F.R. §§ 404.1569a; 416.969a (defining

1   non-exertional limitations as limitations that do not directly affect a claimant's [muscular]

2   strength); *Desrosiers v. Secretary of Health & Human Servs*., 846 F.2d 573, 576-77 (9th Cir.

3   1988) (noting that a sufficiently severe, non-exertional impairment may limit a claimant's

4   functional capacity in ways not contemplated by the guidelines, rendering the guidelines

5   inapplicable and noting that pain, postural limitations, or environmental limitations are examples

6   of non-exertional limitations).

7       The *Tackett* court expressly stated:

8       The Commissioner's need for efficiency justifies use of the grids at step
        five where they *completely and accurately* represent a claimant's limitations.
9       [Citation.] In other words, a claimant must be able to perform the *full range* of
        jobs in a given category, i.e., sedentary work, light work, or medium work.  As
10      explained in *Desrosiers:*
            "This court has recognized that significant non-exertional limitations, such
11      as poor vision or inability to tolerate dust or gases, may make reliance on the grids
        inappropriate.  We have also held that pain can be a non-exertional limitation.
12          However, the fact that a non-exertional limitation is alleged does not
        automatically preclude application of the grids.  The ALJ should first determine if
13      a claimant's non-exertional limitations significantly limit the range of work
        permitted by his exertional limitations.
14          . . . A non-exertional impairment, if sufficiently severe, may limit the
        claimant's functional capacity in ways not contemplated by the guidelines.  In
15      such a case, the guidelines would be inapplicable." [Citation.]
            The ALJ may rely on the grids alone to show the availability of jobs for
16      the claimant "only when the grids accurately and completely describe the
        claimant's abilities and limitations." [Citations.] Examples of non-exertional
17      limitations are pain, postural limitations, or environmental limitations. [Citation.]

18   *Tackett v. Apfel*, 180 F.3d at 1101-02, emphasis in original.

19       The ALJ did not err.  Plaintiff clearly suffered from a non-exertional impairment.  When

20   a claimant suffers from pain or other non-exertional limitations, an ALJ cannot prove the

21   existence of jobs available to that claimant by using the grids and, instead, must prove such

22   existence through expert vocational testimony.  *Tackett v. Apfel*, 180 F.3d at 1101-02; *see also*

23   *Thompson v. Sullivan*, 987 F.2d 1482, 1491-92 (10th Cir. 1993).

24              **2.      Findings re Language Abilities**

25       Plaintiff speaks primarily Spanish.  The ALJ determined however that Plaintiff was able

26   to communicate in English and had a limited ability to read and write in English.

27       A distinction exists between an assessment of literacy and an assessment of the ability to

28   communicate in English.  An ALJ must consider both in determining whether a claimant can

perform work pursuant to the regulations.  20 C.F.R. §§ 404.1564(b), 416.964(b).  "Illiteracy" is

defined as the "inability to read or write."  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  A

claimant who is able to read or write a simple message in English is not considered illiterate.

*Ibid*.  A claimant with the capability to communicate in English is one who can "speak, read, and

understand" the language.  *Id.*, at 404.1564(b)(5), 416.964(b)(5).

Here, the ALJ found as follows:

> The claimant has a limited education and is able to communicate in
> English [citation].
> The claimant is able to speak in English, even though his primary language
> is Spanish.  While an interpreter was used at the hearing, the undersigned was able
> to directly communicate with claimant in English.  His children and wife
> occasionally speak English and he converses with them in English.  When he goes
> out, he speaks English in stores.  He is able to watch TV programs in English.  He
> understands more than he speaks in English.  He has a limited ability to read and
> write in English.  He completed nine years of formal education.

AR 20.

Plaintiff is capable of communicating in English because he can speak and understand

English, although he understands more than he speaks.  He can understand English speaking

television programs "if it's not real hard."  AR 250.  He can converse with store clerks in English

"if it's not something real, real hard . . .."  AR 249.  His children speak to him in English; his

wife does so occasionally.  AR 250.  In fact, at one point the ALJ asked Plaintiff to respond to his

inquiry in English:

> [ALJ]: Do you ever speak English in the course of a day since you stopped
> working?
> [INTERPRETER]:  Since he stopped working?
> [ALJ]:  Yes, now that he doesn't have anyone to translate for him does he
> speak English at all at home or when he goes out?
> [PLAINTIFF]:  Yes, I do speak it with my children.
> ALJ:  Could you give me an example on how well you speak?
> PLAINTIFF: Should I say it in English?
> ALJ:  Yes please.
> PLAINTIFF:  Yes, when I pick up my daughter I ask him how she's doing
> in the school and I ask him, I ask her, my [INAUDIBLE] if he have problem in the
> school, if he have homework, something like that, you know.

AR 248.

In *Silveira v. Apfel*, 204 F.3d 1257 (9th Cir. 2000), the Ninth Circuit clarified that a claimant is illiterate if she is illiterate or unable to communicate in English, or both, not that a claimant must be both illiterate and unable to communicate in English. *Id.*, at 1262, n. 13.[4]

With regard to whether or not Plaintiff can read and write English, the record here is extremely limited. At the hearing, the following colloquy occurred:

> [ATTORNEY ABARCA]: But as far as reading and writing, your Honor, you didn't, can we ask him about that or is it just a matter of being able to talk English?
> ALJ: Well, able to communicate I, I still need to have read and write. Is that correct you can't read, can you read anything in English?
> CLMT: I can read a little bit and I can write a little bit, not much.
> ALJ: I'm rea[ch]ing a conclusion that he's able to communicate. I'm not suggesting to you that he can communicate at the level that he can communicate in Spanish but he can certainly communicate at a sufficient level that he could exist and operate within a workplace but I, you know, I want to give you an opportunity to address that.
> ATTY: Well, I'm at a loss for words actually.

AR 250-251. Despite being provided an opportunity ask her client more questions concerning his proficiency in both reading and writing in English, as well as orally communicating in English, Ms. Abarca completely failed to address either issue despite expressing incredulity with the ALJ's conclusion about Plaintiff's communication skills. *See* AR 251-262. Additionally, the ALJ did not attempt to determine what Plaintiff meant by "a little bit." Nor did the ALJ's decision explain what "a limited ability" to read and write in English meant.[5] This evidence is insufficient to support a finding that Plaintiff is literate. A vague response of "[a] little bit" in response to whether or not a claimant can read or write English is insufficient to establish that Plaintiff can read or write a simple message in the English language. 20 C.F.R. §§

---

[4]In addition to Plaintiff's testimony on the issue, this Court notes the following from the record: (1) Dr. Christopher noted Plaintiff "speaks English and Spanish and is not as fluent in English, however, his wife is very fluent in English and they have conversed . . ." AR 179; (2) Dr. Christopher's report of June 14, 2005, indicates the doctor spoke with Plaintiff extensively about his knee problems and that Plaintiff "does understand some English, however, we have had an interpreter, Maria, come in and explain this also. He seems to understand" AR 171; and (3) Dr. Gurdin's December 15, 2005, report notes that Plaintiff was "alert, pleasant and cooperative and speaks fairly good English" AR 190.

[5]Plaintiff testified he has never taken English language classes (AR 249) and it is presume his nine year of form education took place in Mexico and did not include instruction in English.

14

1   404.1564(b)(1), 416.964(b)(1).  Perhaps indeed he can, but the record is far from clear.[6]  *Silviera*

2   *v. Apfel*, 204 F.3d at 1262; see also *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987);

3   *Delgado v. Barnhart*, 305 F.Supp.2d 704, 715 (S.D. Tex. 2004).[7]

4          Moreover, because the capability to communicate in English pertains to one who can

5   "speak, *read*, and understand" the language (20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5),

6   emphasis added), the lack of information in the record pertaining to Plaintiff's ability to read is

7   insufficient to uphold the ALJ's finding regarding Plaintiff's ability to communicate.

8          In sum, the ALJ's findings are not supported by substantial evidence and are not free of

9   legal error.  For that reason, the matter will be remanded for further proceedings consistent with

10   this opinion.

11          **B.**       ***The ALJ's Credibility Finding***

12          Plaintiff asserts the ALJ erred by failing to provide clear and convincing reasons for

13   rejecting Plaintiff's testimony regarding his pain.  (Doc. 13 at 14-21.)  Defendant counters the

14   ALJ provided the necessary reasons and that those reasons are supported by substantial evidence

15   in the record.  (Doc. 19 at 13-16.)

16          The ALJ is required to make specific findings assessing the credibility of plaintiff's

17   subjective complaints.  *Ceguerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991).  In rejecting

18   the complainant's testimony, "the ALJ must identify what testimony is not credible and what

19   evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

20   1996) (quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir.

21   1988)).

22

23

24          [6]The Court agrees that it does not appear that Plaintiff personally completed a number of the documents that
25   make up the record in this case.  There are distinct differences in the writing styles on the various documents.  More
     particularly, the writing style employed in the substantive body of the documents is district from the Plaintiff's
26   signature.  While the forms do inquire as to whether or not the claimant himself personally completed the forms - and
     the forms reflect a response in the affirmative - the Court is not persuaded that Plaintiff here personally completed
27   the documentation.  The varying styles can be seen at AR 31, 37, 85-92, 101-104, 111, 141-147, and 157-160.

28          [7]The Court also notes the record contains written correspondence from the Commissioner to Plaintiff in
     Spanish.  *See* AR 12-14, 48-53, 75-80.

"Despite the inability to measure and describe it, pain can have real and severe
debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from
working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  It is possible to suffer disabling
pain even where the degree of pain is unsupported by objective medical findings.  *Id*.  "In order
to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that
decision." *Id*. (citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989)).  The findings
must convincingly justify the ALJ's rejection of the plaintiff's excess pain testimony.  *Id*. at 602.
However, an ALJ cannot be required to believe every allegation of disabling pain.  "This holds
true even where the claimant introduces medical evidence showing that he has an ailment
reasonably expected to produce some pain." *Id*. at 603.

The ALJ may use "ordinary techniques" in addressing credibility.  *Light v. Soc. Sec.
Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the
evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

If a claimant is able to spend a substantial part of his day engaged in pursuits involving
the performance of physical functions that are transferable to a work setting, a specific finding as
to this fact may be sufficient to discredit a claimant's allegations.  *Morgan v. Commissioner of
Social Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).  The ALJ must make "specific findings
relating to [the daily] activities" and their transferability to conclude that a claimant's daily
activities warrant an adverse credibility determination. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir.
2007) (citing *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

In this case, the ALJ did not ignore or reject plaintiff's testimony solely because it was
unsupported by objective evidence.  The ALJ also made other findings in support of his
determination that plaintiff's complaints of pain were exaggerated.  The Court turns to address
these findings.

Plaintiff finds fault with each reason provided by the ALJ for finding him only partially
credible.  (Doc. 13 at 14-20.)  He complains the reasons provided "are factually and/or legally
erroneous" and thus "should not be deemed to be 'clear and convincing.'" (Doc. 13 at 20.)  Yet

1    for many of the assertions identified as error by Plaintiff, he has failed to provide any authority

2    for his position on the point.

3            The ALJ found as follows:

4            After considering the evidence of record, the undersigned finds that the
         claimant's medically determinable impairments could reasonably be expected to
5        produce the alleged symptoms, but that the claimant's statements concerning the
         intensity, persistence and limiting effects of these symptoms are not entirely
6        credible.
             The claimant is only taking Tylenol for his allegedly disabling knee pain.
7        Further, he only takes it once or twice per week.
             His knee pain does not prevent him from operating a car, which he uses to
8        shop at the grocery store.
             Treating records show that the claimant's knee functions well as long as he
9        wears his brace.  These notes show that he is tolerating the brace without any
         reported problems.
10           The weight of the objective evidence does not support he claims of the
         claimant's disabling limitations to th degree alleged.  Exams show full range of
11       motion in both knees and no effusion. There is no indication of consistent
         swelling or inflammation [citations].
12           The record does not show that the claimant requires any special
         accommodations (e.g., special breaks or positions) to relieve the pain or other
13       symptoms.
             In contrast to the allegations of the claimant's disabling fatigue and
14       weakness, he does not exhibit any significant disuse muscle atrophy, loss of
         strength, or difficulty moving that are indicative of severe and disabling pain.
15           Although the claimant has been prescribed and has taken appropriate
         medications for the alleged impairments, which weighs in [his] favor, the
16       objective medical evidence shows that the medications have been relatively
         effective in controlling the claimant's symptoms.  Moreover, the claimant has not
17       alleged any side effects from the use of medications.
             There is no evidence of loss of weight due to loss of appetite due to pain.
18       There is no evidence of sleep deprivation due to pain.

19   AR 18-19.

20           The Commissioner asserts the ALJ "provided numerous specific, clear, and convincing

21   reasons for finding Plaintiff to be only partially credible." (Doc. 19 at 14.)  In part, the

22   Commissioner points to the ALJ's proper consideration of Plaintiff's use of over-the-counter

23   medications. (Doc. 19 at 14.)  In *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007), the Ninth

24   Circuit held that evidence of "conservative treatment," such as a claimant's use of only over-the-

25   counter pain medication, is sufficient to discount a claimant's testimony regarding severity of an

26   impairment.

27           The ALJ properly considered Plaintiff's daily activities, including driving a car and

28   grocery shopping.  (AR 18.)  Also, while it may not be clear from the record regarding the

1   amount of time Plaintiff may spend behind the wheel of a car everyday, even were this factor

2   improperly considered by the ALJ, in light of the other determinations made regarding Plaintiff's

3   credibility, on the whole there is no error. *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir.

4   2004) (upholding ALJ's credibility determination even though one reason may have been in

5   error).  Interestingly, the Court notes that in a unsigned and undated functional report prepared by

6   a third party, it was reported that Plaintiff grocery shops twice a month for approximately one

7   hour.  AR 107.  In the same document however, it was also reported that Plaintiff could only

8   walk thirty minutes before needing to rest for twenty minutes.  AR 109.

9           The ALJ also properly considered the fact that Plaintiff benefitted from the use of a knee

10  brace.

11          In evaluating the credibility of the symptom testimony, it appears that the ALJ did

12  consider all of the factors set out in SSR 96-7P and 20 C.F.R. §§ 404.1529c(4)(i)(vii),

13  416.929(c)(4)(i)(vii).  *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996), and *Bunnell*,

14  947 F.2d at 346.  The SSR directs the ALJ to consider a (1) claimants daily activities; (2)

15  location, frequency and intensity of claimant's symptoms or pain; (3) precipitating factors and

16  aggravating factors; (4) type, dosage, effectiveness and adverse side effects of any pain

17  medication; (5) treatment for pain relief; (6) any reasons used by the claimant to relieve the pain

18  or symptoms; and (7) other factors concerning the claimant's functional limitations and

19  restrictions due to pain or other symptoms.

20          Moreover, the ALJ provided specific findings and identified the relevant testimony and

21  evidence undermining Plaintiff's complaints.  *Ceguerra v. Secretary of HHS*, 933 F.2d 735;

22  *Lester v. Chater*, 81 F.3d at 834.  Therefore, there was no error and the ALJ's findings are

23  supported by substantial evidence.

24  //

25  //

26  //

27  //

28  //

1

## **CONCLUSION**

2        Because the record is insufficient to support a finding of Plaintiff's ability to read and

3   write English, substantial evidence does not support the Commissioner's decision that Calderon

4   is not disabled.

5        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

6   substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

7   further proceedings consistent with this opinion.  The ALJ shall make specific findings with

8   regard to Plaintiff's ability to read and write in English.  The Clerk of this Court is DIRECTED

9   to enter judgment in favor of Plaintiff Gilberto Calderon and against Defendant Michael J.

10  Astrue, Commissioner of Social Security.

11

12

13        IT IS SO ORDERED.

14  **Dated:    November 10, 2009**              **/s/ Gary S. Austin**
                                                 UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28